IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

AEROTEK, INC.              )
                           )
        Plaintiff,      )
                           )
        v.              )    CIVIL ACTION 05cv1080-JCC-LO
                           )
TYONEK NATIVE CORPORATION, )
TYONEK MANUFACTURING, LLC,  )
                           )
        Defendants.     )

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on a bench trial pursuant to Plaintiff's complaint alleging Breach of Express Contract (Count I), Breach of Express or Implied-in-fact Subcontract (Count II), Tortious Interference with Contract and Contract Expectancy (Count III), Tortious Interference with Prospective Economic Advantage (Count IV), Unjust Enrichment (Count V), Quantum Meruit (Count VI), and Misappropriation of Business Opportunity (Count VII).

After thoroughly reviewing the relevant briefs, memoranda, party testimony, expert testimony, exhibits, and arguments, the Court finds this dispute to be rather simple. This case represents two parties' successful joint pursuit of a mutually advantageous contract to provide services to the Navy, which was performed, albeit contentiously. However, this performance

occurred despite the parties' inevitable failure to agree on the most (and perhaps, the only) crucial term: the price.

The Court finds in favor of Plaintiff in part as to its claims of Unjust Enrichment (Count V) and Quantum Meruit (Count VI), but finds in favor of Defendant as to the remaining claims. Defendant will be ordered to pay any outstanding balance using a benchmark rate of $31.88 and $191,330.88 plus interest for those employees converted to Tyonek in August 2005.

## I. Findings of Fact

1.   Plaintiff Aerotek, Inc. ("Aerotek"), organized as a Maryland corporation, is a recruiting and staffing agency that furnishes employees to commercial and government customers. Aerotek provides technical and engineering employees for a variety of fields, including aviation.  One of Aerotek's customers in the aviation field was the Naval Air System Command Aircraft division ("the Navy").

2.   Defendant Tyonek Native Corporation ("Tyonek") is an Alaska corporation with more than a dozen subsidiary companies that perform defense manufacturing, information technology services, environmental remediation, and oil field support services.  Tyonek is a participant in the United States Small Business Administration's 8(a) business development program, and is therefore eligible to receive "sole-source contracts" from the federal government.

3.   Defendant Tyonek Manufacturing, LLC ("TMLLC") is a wholly owned subsidiary of Tyonek Native Corporation.  In October 2004, Scott Pfeifer became TMLLC's president and sole "Member Representative," a position equivalent to corporate director.  He also retained his position as an officer of Tyonek Native Corporation, vice president of government services, and thus, was an officer of both Tyonek Native Corporation and TMLLC.

4.   From early 2001 to November 2004, Aerotek provided aircraft maintenance services to the Navy facility at Jacksonville, Florida, Virginia Beach, Virginia, and Beaufort, South Carolina. Aerotek had a prime contract with the Navy on a commercial item basis.  A commercial item contract is a contract that provides goods and services that are similar to those that a contractor sells commercially.

5.   In 2004, Aerotek discovered that the Navy was considering converting the current contract held by Aerotek into a minority-owned small business set-aside.  In response, Aerotek decided to seek a "teaming arrangement" with a minority-owned small business that was eligible for sole-source contracts.  Tyonek, fitting this description, simultaneously  wished to increase its presence in contracts that provide services to the federal government.  Thus, what seemed to be a perfect marriage was formed. Alas, as would later become strikingly clear, this one was not meant to be.

-3-

6.   On August 18, 2004, Tyonek Native Corporation entered into a teaming agreement with Aerotek, which provided that they were to cooperate with one another to submit proposals to the government to obtain a sole-source contract, thereby taking advantage of Tyonek Native Corporation's Section 8(a) status.  The teaming agreement provided that if, through the parties' joint efforts, Tyonek Native Corporation was successful in obtaining the award of a prime contract of the government, then Tyonek Native Corporation would use Aerotek/CCG as a subcontractor, and the parties agreed to negotiate on the contract's terms.

7.   Paragraph 2.0 of the teaming agreement provided as follows:

> If Tyonek is selected by the Government as the prime contractor for the contract, it will enter into an exclusive subcontract with Aerotek and CCG for such services as to be mutually determined at the time the proposal is submitted and prior to award.  The parties hereby agree to negotiate in good faith as to the specific terms and conditions of the subcontract Agreement, subject to the agreed to objective that Tyonek will maintain 51% of the applicable Contract costs for the combined total of all task orders issued to date at six-month intervals, unless otherwise approved by SBA, and Aerotek and CCG will retain 49% of the applicable Contract costs.  Any such subcontract, or changes of supplements, in such proposed subcontract shall be subject to and in compliance with applicable laws, required FAR clauses, regulations and statement of work and specifications and terms of the prime Contract, mutual Agreement on pricing and other subcontract terms and conditions, and prior approval and consent of the Government, if required.

-4-

(Pl.'s Ex. 1).  The agreement failed to set forth any mechanisms involving questions of how to reach the 51% and 49% figures or other terms to which the parties could not agree.

8.   After entering into the Teaming Agreement, Aerotek and Tyonek pursued the prime contract already held by Aerotek for aircraft maintenance at Navy facilities in Jacksonville, Florida and Beaufort, South Carolina.

9.   In late November 2004, when Aerotek's prime contract was due to expire, the Navy had not yet decided whether to award Tyonek Native Corporation a sole-source contract for its future aircraft maintenance requirements at the Navy facility.

10.  On December 1, 2004 the Navy issued Tyonek Native Corporation a 30-day commercial item purchase order for aircraft maintenance services at the Navy facility with the understanding that Aerotek would continue to perform the required services by subcontract.

11.  On January 4, 2005 the Navy awarded a letter contract to TMLLC.  The agreement provided that the parties would negotiate and definitize the final terms and conditions of the contract for performance.

12.  At first, Aerotek leased its personnel to Tyonek to perform the contract under the mistaken belief that this would be consistent with SBA requirements that the 8(a) contractor provide 51% of the costs of personnel utilized to perform an 8(a) contract. However, on January 10, 2005 the Navy demanded that TMLLC directly

employ, rather than lease, a minimum of 51% of the costs of personnel necessary to complete the contract. In response, Aerotek transferred 72 employees, including the project manager, to TMLLC's payroll. Aerotek's employees would continue to perform 49% of the work as subcontractor to TMLLC throughout the remainder of the contract, thereby reaping profit that would not be available to Aerotek unless the transfer was made. At the time of the transfer, no compensation for the transfer was agreed upon or discussed.

13. From January 4 to mid-August 2005, TMLLC performed on the letter contract as prime contractor and Aerotek performed as a TMLLC subcontractor. This performance occurred despite the fact that the parties had yet to agree on the price to be paid for the aircraft maintenance employees. During this time period (January 4 to mid-August 2005), Aerotek regularly submitted invoices to TMLLC for its services that exceeded the rates that TMLLC procured for the Navy.

14. On July 19, 2005, Aerotek and Tyonek met with the Navy contracting officer Margaret Hayden-Stone to finalize the terms of the contract. The Court heard testimony from John Jones and John Bowers, Aerotek's representatives at the meeting, as well as Chris Scaife, Defendants' representative, as to what transpired on that date. To no surprise, the accounts widely differ. The Court found Scaife's testimony more reliable and more credible than Bowers's and Jones's testimony as to the events of this meeting.

-6-

*Compare* (Trial Tr. III, 726-38) *with* (Trial Tr. I, 63-72, Trial Tr. II, 436-44).  Essentially, Tyonek Native Corporation believed in good faith that a deal had been reached, and Aerotek tried to renege on the contract by renegotiating the prices to be charged for aircraft mechanics.  (Trial Tr. II, 443-44, Trial Tr. III, 741).  Nevertheless, regardless of the numerous details of this meeting that both parties painstakingly attempted to distill at trial, the Court finds that the evidence clearly demonstrates one significant fact: no agreement had ever been reached as to the price.

15.  On August 4, 2005, John Jones of Aerotek proposed an hourly rate for an aircraft mechanic at the Jacksonville base of $32.66.[1] (Trial Tr. II, 450-451); (Pl.'s Ex. 64).  He selected this rate because he felt it was fair and he believed it was "close" to the $32.61 rate mentioned at the July 19th meeting.  (Trial Tr. II, 451).

16.  Several days later, on August 8, 2005, Tyonek Native Corporation and TMLLC sent Aerotek a letter on Tyonek Native Corporation stationery requesting Aerotek to submit the best and final offer, including labor rates.  (Pl.'s Ex. 68); (Trial Tr. I, 95-96, Trial Tr. III, 555-56).  Again, Aerotek replied with the

---

[1] The hourly rate for aircraft mechanics at the Jacksonville base was used as shorthand by the parties and the Navy when discussing labor rates, as the plurality of employees were employed in that position.  A change in that positions's rate would be reflected incrementally in the rates of all other positions.  (Trial Tr. 52-52)

rate of $32.66, and an additional $166,000 in recruiting costs. (Pl.'s Ex. 71); (Trial Tr. III, 556).  Tyonek Native Corporation and TMLLC rejected Aerotek's offer since it was considerably higher than the rates discussed at the July 19th meeting, and declared that negotiations were at an end.  (Pl.'s Ex. 73); (Trial Tr. III, 750).  TMLLC issued a stop-work order on August 12, 2005 because it believed in good faith that Aerotek was using its leverage for the remaining employees to require higher payment than previously billed.  (Pl.'s Ex. 73).  Faced with two difficult options, either offer employment to Aerotek employees to continue with the contract or breach the Navy contract by lack of performance, TMLLC decided to offer employment to the remaining Aerotek employees, which they accepted.

17.   TMLLC paid Aerotek the sum of $239,982.99 for work it owed Aerotek since 2005.  The rate upon which this payment was based is unclear.

18.   Aerotek sued Tyonek and TMLLC, alleging Breach of Express Contract (Count I), Breach of Express or Implied-in-fact Subcontract (Count II), Tortious Interference with Contract and Contract Expectancy (Count III), Tortious Interference with Prospective Economic Advantage (Count IV), Unjust Enrichment (Count V), Quantum Meruit (Count VI), and Misappropriation of Business Opportunity (Count VII).  The Court will address each Count in the analysis that follows.

## II. Conclusions of Law

Plaintiff Aerotek is a corporation organized under the laws of Maryland with its principal place of business in Maryland.  Defendants Tyonek and TMLLC are both corporations organized under the laws of Alaska with their principal place of business in Alaska.  Thus, these parties are diverse for purposes of jurisdiction.  Since this dispute involves an amount in controversy greater than $75,000, this Court has proper diversity jurisdiction under 28 U.S.C. § 1332.

### A.  Count I - Breach of Express Contract(Teaming Agreement)

At the close of Plaintiff's evidence, this Court granted Defendants' motion for judgment as a matter of law as to Count I. Plaintiff now moves this Court to reconsider its decision.  As was belabored at trial, the Teaming Agreement governing the relationship between the parties constituted only an agreement to negotiate.  At the end of Plaintiff's case-in-chief, it was clear that Defendant had made reasonable efforts to negotiate, as demonstrated by Aerotek's non-customary presence at the definitization meeting as well as Tyonek's continued attempts to reach a reasonable figure after Aerotek continued to re-negotiate. Thus, the evidence was insufficient to demonstrate a breach of the Teaming Agreement, and the Court's decision to grant judgment as a matter of law on Count I will stand.

Plaintiff argues that this decision is contrary to the Court's prior ruling on Defendants' motion to dismiss, and moves this Court to reconsider its grant of judgment in order to prevent manifest injustice. The Court is surprised at Plaintiff's confusion, but will attempt to clarify. In its motion to dismiss, Defendants argued that the Teaming Agreement was merely an agreement to agree, and in accordance with the precedent of *Valdez Fisheries,* was unenforceable. This Court rejected that argument then and would still reject it now. This was not the basis for the grant of judgment as to Count I, and this Court cannot fathom what led Plaintiff to believe otherwise. As stated above, the Teaming Agreement governing the parties was an enforceable agreement to negotiate. This Court has never held to the contrary, whether before, during, or after trial. Nevertheless, this was not the reason for Count I's dismissal. Count I was dismissed because, at the close of Plaintiff's evidence, Plaintiff had not provided the Court with a legally sufficient evidentiary basis to conclude that Defendants did not exert reasonable efforts to negotiate in breach of the Teaming Agreement. Fed. R. Civ. P. Rule 50(a). Without sufficient evidence of a breach, this Court cannot hold in favor of Plaintiff's as to Count I, and judgment for Defendants was correctly granted. Plaintiff's motion for reconsideration is denied, and the grant of judgment for Defendant on Count I will remain.

B.   Breach of Express or Implied Subcontract by TMLLC -
     Count II

     In Count II, Aerotek alleges that TMLLC breached the
terms of an express or implied-in-fact contract and seeks to
recover payment for services rendered as well as lost profits.  The
Court finds that no such subcontract existed, and Plaintiff's
breach of contract claim will be denied.

     Contracts are express when their terms are stated by the
parties.[2]  *Williston on Contracts* (4th ed.) §1:5.   If a contract
is not express, then it is generally held to be implied.  *Potter v.
Florida Motor Lines*, 57 F.2d 313 (S.D. Fla. 1932); *Bromer v.
Florida Power & Light Co.*, 45 So. 2d 658 (Fla. 1949).   Contracts
are implied-in-fact from the facts and circumstances of the case,
and under Florida law, negotiations between parties will not serve
to create an implied-in-fact contract.  *Osceola Farms Co. v. Wilder
Bros. Farms, Inc.,* 364 So. 2d 43 (Fla. Dist. Ct. App. 1978).   To
create a contract by implication, one party must make an
unequivocal and unqualified assertion of right, coupled by such
silence by the other party as to support the legal inference of
that party's acceptance or acquiescence.  *Kanter v. Safran*, 68 So.
2d 553 (Fla. 1953); *Miller-Dunn Co. v. Green*, 16 So. 2d 637 (Fla.
1944).   A plaintiff relying upon an alleged implied-in-fact

---

[2] In its post-trial proposed conclusions of law, Plaintiff only argues
that an implied-in-fact contract existed.  This position is understandable
since no evidence suggests that all the terms were every expressly agreed upon
or stated.  Accordingly, this Court need not address any concerns of an
express subcontract between the parties.

contract has a greater burden than one who uses reasonable care and foresight in protecting himself by means of an express contract. *Bromer*, 45 So. 2d at 660.

This case represents two parties' good-faith attempts at negotiation, but explicit failure to ever agree upon the price. The parties attempted to find a mutually agreed-upon price to govern the contract before, during, and after the "definitization" meeting with the Navy contracting officer. No price was agreed upon, and the parties were at vigorous opposition as to what that price would inevitably be. In the face of this vigorous opposition, the Court cannot conclude that either parties' conduct represented acceptance or acquiescence to the other parties' suggested price term, thereby creating an implied contract. Accordingly, Plaintiff has failed to meet its burden to establish an implied-in-fact contract, and thus, no subsequent breach occurred. As to Count II, this Court finds in favor of Defendant.

C. Count VI - Quantum Meruit

Plaintiff argues in the alternative that, if no subcontract existed, it is entitled to recover for the value of its services rendered under the theory of *quantum meruit*. Under Florida law, the elements of *quantum meruit* are that (1) plaintiff conferred a benefit on defendant; (2) defendant has knowledge of this benefit; (3) defendant has accepted or retained the benefit conferred; and (4) circumstances are such that it would be

inequitable for defendant to retain the benefit without paying fair value for it. *Posley v. Eckerd Corp.*, 433 F. Supp. 2d 1287 (S.D. Fla. 2006).

There is no dispute that Plaintiff Aerotek, whose employees were working (despite no price ever being agreed-upon) for Defendant Tyonek, conferred a benefit on Defendant. Defendant knowingly accepted this benefit as part of the contract, and for Aerotek not to be compensated for the work performed by those employees would be inequitable.

Defendant Tyonek established at trial that it had made numerous payments to Aerotek for the work performed by Aerotek's employees on the Navy contract, and argued that its last payment of $239,982.99 on August 23, 2006 eliminated any balance due. However, the rate upon which these payments were based was unclear, and it was undoubtedly not agreed upon. Absent an agreement as to the amount to be paid, the doctrine of *quantum meruit* permits recovery of the reasonable value of the services rendered. *See, e.g., Miller v. Greene,* 104 So. 2d 457 (Fla. 1958).

Since the rate was never agreed upon, this Court must decide the reasonable rate at which Aerotek should be compensated. *Id.* Aerotek submitted numerous invoices at $32.75, the rate for an aircraft maintenance mechanic at the Jacksonville base, a position rate that the parties used as a benchmark. (Pl.'s Ex. 79); (Trial Tr. I, 116). When asked for its best and final offer, Aerotek

proposed a rate of $32.66.   (Pl.'s Ex. 71); (Trial Tr. III, 556).
On the other hand, Tyonek consistently maintained that $31.88
($31.45 plus an additional $0.43 for recruiting) was the most that
it could pay Aerotek.   (Def.'s Ex. 18, 19, 21); (Trial Tr. III,
740, 745).

          This Court finds that $31.88 represents a reasonable rate
at which Aerotek should be compensated primarily for two reasons.
First, the best evidence of a reasonable rate is Aerotek's prior
contract with the Navy, at which it billed at a rate of $31.07 as
the prime contractor.   This leads the Court to believe that $31.88
is not an unreasonable value, especially when compared to
Plaintiff's unyielding $32.66. Second, the Court found Defendants'
witnesses Scaife and Pfeifer credible in their explanation of what
constitutes a reasonable rate and how Tyonek arrived at the $31.88
figure.   (Def.'s Ex. 18, 19, 21); (Trial Tr. III, 740, 745).   To
the contrary, the Court finds Aerotek's Bowers and Jones incredible
and their explanations lacking.   In explaining why Aerotek selected
$32.66, they relied on conclusory statements and inapplicable
comparisons, asserting that the price was: (1) "fair" or "close" to
previously negotiated rates with Tyonek; (2) "in line with" pricing
on its previous contract with the Navy ($31.07); and (3) that it
was the same price Aerotek charged in the private sector, despite
the fact this was a government contract.   (Trial Tr. I, 98-103,
Trial Tr. II, 434-35, 450-51).

Therefore, as to Plaintiff's claim of *quantum meruit*, Tyonek will compensate Aerotek using a benchmark rate of $31.88, if it has not already done so.  If this balance has already been satisfied, then Defendant need not make any more payment to Plaintiff to compensate for services rendered.

D.   Tortious Interference with Contract and Contract Expectancy - Count III

In Count III, Plaintiff alleges that Defendants Tyonek and TMLLC interfered with Aerotek's contract with the other Defendant.  This claim fails as to both Defendants.  Under Florida law, a claim for tortious interference with contractual rights is successful upon plaintiff's demonstration of (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages from the breach. *Farah v. Canada*, 740 So. 2d 560, 561 (Fla. Dist. Ct. App. 1999).

First, Aerotek argues that TMLLC interfered with the Teaming Agreement between Aerotek and Tyonek.  As stated in open Court and also re-visited above, there was insufficient evidence to establish a breach of the Teaming Agreement by Defendants.  The evidence demonstrated that Defendants negotiated in good faith, as required by the Teaming Agreement.  Without an intentional breach of the contract, there can be no tortious interference with contractual rights, and thus, this claim fails as to TMLLC.

-15-

Second, Aerotek argues that Tyonek interfered with Aerotek's subcontract with TMLLC.  As this Court stated in its discussion of Count II, no subcontract ever existed between TMLLC and Aerotek, as incontrovertibly evidenced by their failure to agree on a price.  Without the existence of a contract, no tortious interference with contractual rights could have occurred, and thus, this claim fails as to TMLLC.  Thus, Plaintiff's claim of tortious interference with contractual rights fails.

E.   Tortious Interference with Prospective Economic Advantage - Count IV

In Count IV, Plaintiff Aerotek alleged that Defendants tortiously interfered with Aerotek's prospective economic advantage.  To establish tortious interference with prospective economic advantage, Plaintiff must demonstrate: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach.  *Ethan Allen, Inc. v. Georgetown Manor*, *Inc.,* 647 So. 2d 812, 814 (Fla. 1994).

Aerotek alleges TMLLC interfered with its prospective economic advantage from its business relationship with Tyonek, and that Tyonek interfered with its prospective economic advantage from its business relationship with TMLLC.  These claims fail for numerous reasons.  First, as Aerotek has asserted throughout trial, TMLLC is wholly owned and completely controlled by Tyonek.

-16-

Under the parent-subsidiary rule, a parent and its subsidiary are the same party, and a party cannot tortiously interfere with a contract with itself. *See, e.g., Babson Bros. Co. v. Allison*, 337 So. 2d 848, 850 (Fla. 1976). Therefore, a tortious interference claim cannot be brought against the parent or its subsidiary when one is a party to the contract. *Id.* Since TMLLC cannot interfere with a business relationship to which Tyonek is a party, and Tyonek cannot interfere with a business relationship TMLLC is a party, Plaintiff's claim of tortious interference with prospective economic advantage fails.

Second, even if the parent-subsidiary rule did not apply, the evidence at trial did not demonstrate any unjustified interference by Defendants. Both parties were responsible for the failure to reach an agreement after negotiations. Negotiations were at an impasse, and performance of the contract was already underway. Defendants could either offer employment to the remaining Aerotek employees or cease performance of the Navy contract. Defendants elected to offer employment to Aerotek's remaining employees to continue the contract's performance. This action was not unjustified, improper, or in bad-faith, but instead was necessary and reasonable.

Third, to find that Defendants interfered with Aerotek's prospective advantage, this Court must also find that, without any interference by Defendants, an understanding between the parties

-17-

would have been completed. *United Yacht Brokers v. Gillespie*, 377 So. 2d 688 (Fla. 1979). Again, negotiations were at an impasse when Defendants offered employment to the remaining Aerotek employees. All the evidence supports the conclusion that the parties would remain vigorously opposed with respect to the price governing the contract. This Court cannot conclude that, without Defendants' actions, the parties would have reached an agreement. Accordingly, Plaintiff's claim of tortious interference with prospective economic advantage fails.

### F. Count V - Unjust Enrichment

In Count V, Aerotek seeks recoupment of the value of the employees "wrongfully taken and retained" by Defendants, through which they have been unjustly enriched. To prove a claim for unjust enrichment, Aerotek must demonstrate (1) Aerotek conferred a benefit on Defendants; (2) Defendants had knowledge of the benefit; (3) Defendants accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for Defendants to retain the benefit without paying fair value for it. *Fla. Power Corp. v. City of Winter Park*, 827 So. 2d 322 (Fla. 2004).

Aerotek claims that, as a recruiting and staffing company, its employees are valuable assets, and without the transfer to Tyonek, Aerotek could have placed these employees in other projects. To properly analyze Plaintiff's unjust enrichment

claim, the employees retained by Defendants must be placed in two categories: (1) the 72 employees that Aerotek voluntarily transferred in January 2005, and (2) the 42 employees Tyonek converted in August 20005. The Court will independently address Plaintiff's claim as to each group.

As to the 72 employees transferred to Tyonek's direct employ, Aerotek never contemplated being paid a lump recruiting fee for those employees. Despite being an experienced, sophisticated contractor, Aerotek failed to mention or discuss any other compensation or agreement as a lump payment for compensation of these employees at the time of the transfer. Instead, the evidence demonstrates that these employees were transferred voluntarily by Aerotek in a bargained-for exchange from which it expected a profit. Specifically, Aerotek would allow Tyonek to directly employ the 72 employees, and Aerotek would receive two benefits in return. First, it would benefit from the additional amount added to the hourly rate ($0.43 of the aforementioned $31.88 figure), which was earmarked to compensate Aerotek for its recruiting as to these employees during negotiations. Second, Aerotek would remain as the subcontractor, earning significant revenue from the contract. Inevitably, Aerotek's role in the contract would dissolve due to the aforementioned failed negotiations, but at no fault of Tyonek. Accordingly, the circumstances are not such that

it would be inequitable for Tyonek to retain the benefit, and Plaintiff's unjust enrichment claim fails as to these employees.

However, unlike the January 2005 transfer, Aerotek would receive absolutely no benefit from the conversion of the 42 Aerotek employees after the stop work order, nor had any such benefit been contemplated.  The stop work order was issued by Tyonek, and the remaining Aerotek employees were immediately offered jobs with Tyonek.  Defendants argue that Aerotek had no use for the employees, and if Aerotek planned to use them in other projects, it could have offered the employees different jobs.  The Court is not persuaded by this argument for two reasons.  First, this change-over happened in a very short period of time, and Aerotek cannot be prejudiced for not placing their employees in other projects in the scope of a few days.  Second, regardless of Aerotek's future plans of the employees, they were Aerotek's assets, and it was Aerotek's decision as to how they would be deployed, not Tyonek's.  As a recruiting company, Plaintiff spent considerable resources in finding these employees and using them in this contract from which it intended to benefit.  The Court recognizes Tyonek's difficult position:  either offer employment to the remaining 42 Aerotek employees or cease performance of the Navy contract.  For this reason, the Court does not find that Tyonek acted in bad faith.  Nevertheless, bad faith or not, Tyonek knowingly accepted the benefit of Aerotek's employees after the conversion, and Aerotek

-20-

received nothing in return.  The circumstances are such that it would be inequitable for Tyonek to retain this benefit without providing compensation to Aerotek. Accordingly, Plaintiff's claim for unjust enrichment prevails as to the 42 employees converted during August 2005.

### G.  Count VII - Misappropriation of Business Opportunity

In Count VII, Aerotek alleges that Defendants misappropriated Aerotek's business opportunity to provide aircraft maintenance to the Navy.  Such a misappropriation takes place when "a fiduciary obligor is precluded from appropriating for himself a business opportunity that belongs to the fiduciary beneficiary." *Cohen v. Hattaway*, 595 So. 2d 105, 108-09 (Fla. Dist. Ct. App. 1992).  This claims fails for two reasons.  First, Plaintiff fails to establish that Defendants owed a fiduciary duty to Aerotek. These parties, dealing at arm's length, jointly pursued the contract, and both were able to negotiate rates with the Navy, as occurred at the July 19th definitization meeting.  Tyonek did not owe any fiduciary duty to Aerotek simply because it was a subcontractor on the Navy contract.  Second, even if a fiduciary duty existed, as this Court has repeatedly stated, Defendants did not act improperly or in bad faith.  Defendants negotiated with Plaintiff, striving to reach a mutually agreed-upon price for both Aerotek and the Navy, and the parties equally share the fault in failing to reach an agreement.  Nevertheless, just as this Court

-21-

cannot state Aerotek's inflexibility to lower its best and final offer of $32.66 was bad faith, neither can this Court hold Defendants acted improperly when they rejected it, and declared negotiations at an impasse.   Finally, this Court also cannot conclude that Defendants' offers of employment to Aerotek's employees was improper, given their difficult position of either offering employment or breaching the contract.   In sum, since Defendants did not act in bad faith, they could not have improperly misappropriated any business opportunity, regardless of whether a fiduciary obligation existed.   Accordingly, Plaintiff's claim for misappropriation of business opportunity will be denied.

### III. Damages

#### A.  Unpaid Invoices

Defendants will pay Aerotek based upon a Jacksonville aircraft mechanic rate of $31.88 as a benchmark, and appropriately incrementing other positions.   The Court understands Defendants have already made several payments to Aerotek, although it is unclear upon what rate these payments were based.   Nevertheless, those payments will be applied to the amount due, and Tyonek will pay for any remaining balance.   Furthermore, interest shall be included on any remaining balance, and shall be calculated at a rate of 6% accruing from the first day of trial, and will continue to accrue until judgment is paid.  Va. Code Ann. § 6.1-330.54.

B.  Lost Profits

Since the Court found that no subcontract existed, and thus no subsequent breach occurred, Plaintiff is not entitled to lost profits.

C.  Value of Employees

For the 42 Aerotek employees converted to Tyonek in August 2005, Defendants must pay for their value as assets to Aerotek.  The Court is persuaded by Plaintiff's expert's damage calculation as to these employees, and Defendant fails to provide the Court with any persuasive reason why the calculation is incorrect.  Accordingly, Defendant will be ordered to pay $191,330.88.  Interest on this amount at a rate of 6% will be granted, accruing from the date of the August 25, 2005 and will continue to accrue until judgment is paid.

## IV.  Conclusion

The Court finds in favor of Plaintiff in part as to its claims of Quantum Meruit (Count VI) and Unjust Enrichment (Count V), but finds in favor of Defendant as to the remaining claims. Defendant will be ordered to pay any outstanding invoices at a benchmark rate of $31.88 and $191,330.88 plus interest for those employees converted to Tyonek in August 2005.

An appropriate Order will issue.

April 2, 2007                    _____/s/_____
Alexandria, Virginia                   James C. Cacheris
                                 UNITED STATES DISTRICT COURT JUDGE

-23-